## McALLISTER v McALLISTER

Ohio Appeals, 2nd Dist, Franklin Co

No 2861. Decided April 12, 1938

George Landis, Columbus, Attorney for Plaintiff-Appellee.

Barton Griffith, Columbus, and Phil S. Bradford, Columbus, Attorneys for Defendant-Appellant.

## OPINION

By BARNES, PJ.

The above entitled cause is now being determined as an error proceeding by reason of defendant's appeal on questions of law from the jurgment of the Court of Common Pleas (Domestic Relations) of Franklin County, Ohio.

The action was for divorce, custody of child, alimony for support of plaintiff and minor child and distribution of defendant's property. Plaintiff's action was predicated upon extreme cruelty. The specific acts of extreme cruelty set out in the petition are as follows:

"For her cause of action plaintiff states that the defendant has been guilty of extreme cruelty in that he has on numerous occasions abused this plaintiff both mentally and physically during the biggest portion of the sixteen years of her married life with the defendant.

That his depressed spells and violent temper have almost completely ruined the health of this plaintiff; that she has lived in constant fear for her life and that of the child of the parties.

Plaintiff states that the defendant's insulting attitude and sullenness during the

greater part of the married life of the parties herein and his persistent use of profane and obscene language in the presence of this plaintiff and of her child, has so humiliated and unnerved her that she is in a continuous state of nerves and on the verge of a nervous breakdown.

Plaintiff states that as early as 1924. she felt that the attitude of the defendant might change if children came into their life, and after having borne one child by this defendant and after the loss of said child, and contrary to the advice of the doctor of the plaintiff, she bore another child to this defendant, instead of changing the attitude of the defendant, the coming into his life of this second child caused him to become more unbearable, sarcastic and insulting; that in the year 1928 the defendant's temper had become quite uncontrollable and during one of his rages, he drove his fist through the window: that during the same year, in one of his fits of temper and uncontrollable rage, the child, Helen, attempted to crawl in bed with the defendant and that he deliberately kicked the child out of bed.

Plaintiff says that the defendant has never been willing to help care for the child and has rarely shown any affection for her.

Plaintiff states that during the defendant's fits of temper and rage in 1928 and 1929, the defendant slept with a sword under his bed, keeping this plaintiff in mortal fear for her life because of the uncontrollable temper that he has when he becomes aggravated.

This abuse of the plaintiff continued and in about 1930 the defendant adopted a method of abuse by pinching the plaintiff in order to excite her to anger and tears, constantly warning her when committing said acts never to strike back, as he could not be responsible for what he might do.

Plaintiff says that during this period and by 1933, he had become abnormally jealous and his fits of temper much more pronounced, and in the winter of 1933 he packed his suitcase and stated that he was leaving if the plaintiff went to the child's music teacher's recital. Plaintiff states that during this period was the formative period of her child Helen's life and that she did everything and anything that could possibly be done to cause a feeling of affection between the father and child but by virtue and reason of the defendant's jealousy, abuse to this plaintiff in front of the child, and his use of foul and profane language and ungovernable fits of temper,

he caused the child to be as fearful of him as plaintiff has been.

During the year 1934 the defendant perfected a fancied grudge against this plaintiff and several times grabbed her by the throat, causing this plaintiff to be in fear of her life. Also, during this year he started the habit of getting up in the middle of the night, putting on his clothes. and going out for a walk, threatening when leaving to kill himself, causing this plaintiff mental anguish and agony and causing such a nervous strain on this plaintiff that she has been unable to enjoy normal health.

Plaintiff says that during the spring of 1934, while she was entertaining the bridge club to which she and the defendant belonged, he demonstrated to the entire club his jealousy and inability to control himself, even when a host, leaving his guests and not returning until they had gone, and then in an ungovernable rage and fit of fury, rushed out of doors, brandishing a cane and cursing this plaintiff in loud tones. Plaintiff says that this attitude of the defendant has continued and he has become so sarcastic, unbearable and disliked in the small social crowd to which the plaintiff and defendant belonged that now neither the plaintiff nor the defendant are included in the plans and activities of their former friends, leaving this plaintiff with no diversion, enjoyment or social life, and compelling her alone to put up with this attitude and disagreeable situation and causing her to live in a state of unhappiness, unrest, incompatibility and fear.

Plaintiff states that her relatives and members of her family have not been welcome in her home and that it has been almost impossible for her to entertain her family at all, without going to see them, and when she did want to go to visit them, it caused the defendant to either become sullen or caused him to go into a rage and then in order to avoid these spells on the part of the defendant, she has refrained from seeing her family to the extent that is reasonable and proper.

Plaintiff says that the marital life between these parties has not been normal in any way; that they are not compatible and that no affection exists between them; that the defendant does not consult with the plaintiff about his business, his income, nor even concerning the mutual problems of the family.

Plaintiff says that she is not living with the defendant and was required to leave

him through fear of her life during March, 1937.

Plaintiff says that as a result of the continued and insistent abuses by the defendant, she has become so unnerved that she now lives in mortal fear of her life, is suffering at the present time a physical breakdown and illness, and that her health has been permanently impaired as a result thereof; that she is unable to carry on her ordinary household duties and lives in constant dread and fear of further abuse on account of the threats of this defendant."

Defendant's answer, while making certain admissions, is a general denial and necessarily includes all the specifications of cruelty as set forth in plaintiff's petition.

The action was tried in October, 1937, and decided in December of the same year. The final entry is dated December 16. Defendant gave notice of appeal on December 17th.

Appellant's assignment of errors sets out ten separate specifications. We shall confine ourselves to the major questions as to whether or not under the state of the record, the judgment should be reversed.

In order to determine this question, it is necessary to make a very careful analysis of the testimony presented in the bill of exceptions. In making this analysis, we necessarily must keep in mind the provisions of §11988, GC. The pertinent part of this section reads as follows:

"11988. **Testimony of Parties.** A divorce or judgment for alimony shall not be granted upon the testimony or admission of a party unsupported by other evidence."

Plaintiff was called as a witness upon her own behalf, and the portion of her testimony bearing on the question of extreme cruelty, as charged in the petition, is found starting at the bottom of page 2, following through pages 3 and 4 and the greater portion of page 5, and is herewith set forth in full:

"Q. You have charged in your petition that the defendant has been guilty of extreme cruelty, that is, abused you, mentally and physically, during the biggest portion of your sixteen years of married life. You may state to the Court whether that mental and physical abuse has continued during those sixteen years of your married life during the greater portion of the time?

A. Yes, it has, during the greater portion of it.

Q. You may state whether you and Mr. McAllister have been compatible in your life of living together, whether you have been happy and contented together or whether it has been constant fighting and bickering and troubles between you?

A. It has been, I have been very unhappy; we have had lots of arguments and quarrels.

Q. You have stated in your petition that you have been ill from the effects of his depressed spells and violent temper and that your health has been impaired thereby; will you state to the Court whether that is true?

A. That is true.

Q. You may state to the Court the facts surrounding the decision to have another child after the death of the first child and the purpose for which you decided to have this child and what the doctor's comments were, if any, in regard to the same?

A. I was very ill, you know, and nearly died with the first one, and they told me that I should never have another child, and I felt that perhaps—I had read a great deal and had discussed with different people, and they said very often when there was unhappiness in the home if there was a child it made a difference, and so I had the second little girl deliberately with the hope it would make things different, but I could never see that it did.

Q. The attitude of the defendant towards you and your happiness did not change any after the second child was born?

A. No, it didn't, Mr. Landis.

Q. As a result of this incompatibility, feeling of dislike of you for Mr. McAllister and him for you, or what causes this incompatibility in your married life?

A. I don't know what causes it; it is just a fundamental incompatibility there between the two of us; I don't know what to say has caused it; I suppose there has been a great many things.

Q. Are you not happy with each other?

A. We are not happy with each other, no; we don't understand each other and we never have; there have been a great many quarrels that have not been successfully—have not been, whatever you call it—

Q. The fault has been mutual between you and you are just incompatible?

A. Well, I don't think it has been mutual, Mr. Landis; I don't want to be unfair but I felt that Mr. McAllister was not fair to me; I felt—that may not seem right to say, but I felt I was making a much greater effort than he was.

Q. You have said in your petition that Mr. McAllister was abnormally jealous and that he would leave the house at times and pack his suit case and state he was not coming back; what was the cause of such actions on his part, if you know?

A. I don't know what caused them; he would get mad at me, and I know the time he packed his suit case, Helen's music teacher was having a recital down at the Y.W.C.A. and I wanted to go, and asked his mother to come out and stay with him while I was gone, and I brought her out to the house and before I could drive away she came back out of the front door and said to come in immediately, that Hamilton had his suit case packed and said he was going to leave, and I went back in the house; and he said if I was the right kind of a wife I wouldn't want to go down there, I would stay with him, so she and I spent the evening with him.

Q. Are the allegations in your petition that you have filed here the basis for this incompatibility between you and Mr. McAllister?

A. I didn't understand that, Mr. Landis.

Q. Are the charges that you have made here in your petition the basis for this incompatibility bettweeen you and Mr. McAllister?

A. I think so.

Q. Have you been fearful of any physical abuse or fearful of your life, as you have alleged in your petition, through your living with defendant?

A. Yes, I have; I have been afraid for a long time.

Q. And that has been due to the charges that you have made in this petition?

A. Yes, I feel that when he becomes angry that he loses control of himself; I don't think he realizes what he is doing.

Q. You have charged here that no affection exists between you; is that true?

A. It is true on my part I know.

Q. Did you have anything to say about your family finances or the business or about the defendant's income or any of the mutual problems of the family at all?

A. I have never felt that he has made me a confidant in that way at all and I always felt that he tried to keep things hidden from me and did not make me a real partner and did not trust me in those things

Q. And you feel, Mrs. McAllister, that after sixteen years you are unable to continue to live with the defendant any longer?

A. I do."

No further testimony on this question was given by plaintiff either in her direct examination, cross-examination, recall or or rebuttal.

That this testimony has infirmities is certain.

No specific acts of cruelty were inquired about or testified to. In the main, the inquiries called for conclusions, and the answers are such. It is true, that no objection was interposed to any of the questions, nor was any attempt made to clarify through cross-examination. Even so, we doubt very much if the narrative may be considered evidence.

Even if this may be considered evidence, the further question presents itself as to whether or not there is any corroboration, as required under the above section 11988. Again we search the transcript of testimony and find nothing of a corroborative nature, unless it be the testimony of Mrs. John Summers, page 31 of the bill of exceptions. We herewith quote in full the testimony which possibly would have a bearing on the issue of extreme cruelty:

"You have been closely enough associated with her during that time that you have been able to observe, have you, the reactions between her and her husband as to the question of incompatibility between them, as to whether they have been happy or not?

A. I have.

Q. Whether she has suffered extreme cruelty during the period of their married life?

A. Well, I have certainly seen the reaction from it.

Q. You have?

A. Yes.

Q. You have read the charges that she has filed here, Mrs. Summers?

A. Yes.

Q. You may state to the Court whether these charges that she has made here are from your own knowledge true?

A. I think so, yes."

We can not give to this evidence the characterization of corroboration. The record as a whole fails to present that plaintiff, through evidence, presented the requisite proof to entitle her to the relief prayed for.

Counsel for plaintiff presents argument

in his brief to the effect that he was lulled into a feeling of no contest so far as the divorce was concerned, and hence concentrated all the evidence upon the remaining questions, particularly alimony and division of property. While defendant in his answer denied all allegations of the petition, and in his testimony on page 75 of the record, in one sweeping question answers that all allegations of his answer were true, yet we think the record bears evidence very strongly supporting counsel for plaintiff's contention that there was an attempt to remove from the contest the question of divorce. In any other form of action this would be permitted. However, in actions for divorce there can be no default judgment; neither can admissions of a defendant be received where there is evidence of connivance. It necessarily follows that since judgment ▮▮▮▮▮▮ ▮ by default may not be taken in divorce actions, nothing said by counsel for defendant in an effort to withdraw any and all defenses as to the prayer for divorce can take away the necessity of adequate proof. In determining the question of adequate proof we must consider the provisions of the statute requiring corroboration. **Read v Read, O. L. R. Vol 29, 236.**

Counsel for appellee in his brief makes the claim that much transpired in the chambers of the trial court, not presented through the record. We commend the action of trial courts particularly in divorce actions where minor children are concerned, in their effort to bring about adjustment and reconciliations, but it must be remembered that when the cause goes to litigation the parties must look to their record because the right of review is guaranteed under the Constitution. It is well known that a reviewing court is confined to the record and may not judicially know anything not appearing therein.

There was a time in Ohio when the Supreme Court had adopted the rule that on the grounds of public policy divorce when once granted would not be set aside. This rule was abrogated through the adoption of the Constitutional Amendment of 1912. At the present time the law is very clearly announced that reviewing ▮▮▮▮▮▮ ▮ courts may consider divorce actions on review.

**Campbell v Campbell, 128 Oh St 590; Weeden v Weeden, 116 Oh St 525.**

Since the case is to be retried, we probably should say something on the question of allowance for support, alimony and division of property.

Sec 11988, GC requires corroborative testimony for an award of alimony just the same as it does for divorce.

Counsel for appellant argues very strenuously that the amount allowed is excessive for that reason, if none other, it should be set aside. It is urged that the trial court fixed the value of appellant's assets entirely too high.

This different viewpoint between the Court and counsel may be largely due to the fact that the evidence touching values was not presented in as clear and convincing form as it might have been.

If §11988, GC requiring corroboration had been complied with, we doubt very much if we would be inclined to disturb the amount of the allowance.

When the case is retried, counsel may be able to present to the Court evidence of more convincing character on the question of values.

We are of the unanimous opinion that the judgment of the Common Pleas Court, Domestic Relations, must be ▮▮▮▮▮▮ ▮ reversed because there is no evidence supporting it, that it is manifestly against the weight of the evidence and that the testimony of the plaintiff was and is uncorroborated and unsupported. All parts of the judgment are reversed and cause remanded for further proceedings according to law.

HORNBECK and GEIGER, concur.